**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No.: 3:03CV44**

| | | |
|---|---|---|
| **ANDREW JENKINS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **ORDER** |
| | ) | |
| **THE CITY OF CHARLOTTE,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

      **THIS MATTER IS BEFORE THE COURT** on the "Motion for Summary Judgment" (Document No. 10) and corresponding "Defendant's Memorandum of Law in Support ..." (Document No. 11), both filed February 17, 2004 by the City of Charlotte (the "City"); the "Plaintiff's Memorandum of Law in Opposition ..." (Document No. 13), filed March 2, 2004 by Andrew Jenkins; and the "Defendant's Reply in Support ..." (Document No. 14), filed March 9, 2004 by the City. The parties have consented to magistrate jurisdiction under 28 U.S.C. § 636(c), and this matter is now ripe for disposition.

      Having carefully considered the arguments of the parties and the record, the undersigned will grant the "Motion for Summary Judgment" (Document No. 10).

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

      In 1997, the City hired Mr. Jenkins as a temporary employee working as a Drafting Technician II in the Engineering Department. Mr. Jenkins became a permanent employee in

---

[1] The factual background is related in the light most favorable to Mr. Jenkins, the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

February 1998 when the City hired him as a Field Operations Supervisor in the Street Maintenance Division of the Department of Transportation. Mr. Jenkins is a black male.

As a Field Operations Supervisor, Mr. Jenkins was supervised by Darren Fitzhenry. Mr. Fitzhenry is a white male. Mr. Jenkins worked in the field and supervised approximately thirty employees while working as a Field Operations Supervisor. In his deposition, Mr. Jenkins testified that he experienced two incidents of racial discrimination under Mr. Fitzhenry. First, in Mr. Jenkins' first nine months with the Street Maintenance Division, he reported an incident to Mr. Fitzhenry in which one of the employees Mr. Jenkins supervised, Randy Christenbury, called Mr. Jenkins a nigger. When Mr. Jenkins reported the incident, Mr. Fitzhenry "became agitated and told [Mr. Jenkins] to get out of his office." The second incident Mr. Jenkins described in his deposition was Mr. Fitzhenry's use of the term "PWT" – poor white trash – to refer to people with whom Mr. Fitzhenry encountered in his professional capacity.

In March 1999, Mr. Fitzhenry completed a Performance Plan and Appraisal ("Performance Appraisal") for Mr. Jenkins. Mr. Fitzhenry assessed Mr. Jenkins' performance as "Good." At the time, the rating categories were (i) "Consistently Far Exceeds Requirements," (ii) "Good Performance Which Meets and Periodically Exceeds Requirements," (iii) "Meets Basic Requirements," and (iv) "Did Not Meet Basic Requirements."

In November 1999, Mr. Jenkins interviewed with Larry Johnson, Assistant Director of Transportation for Street Maintenance and Traffic Operations, for a promotion to Operations Supervisor. Mr. Jenkins received the promotion, and Mr. Johnson became Mr. Jenkins' direct supervisor. Mr. Johnson is a white male. As an Operations Supervisor, Mr. Jenkins directed the City's Northeast District Orr Road Facility ("Orr Road") and supervised approximately seventy

employees.

Mr. Johnson made a number of discriminatory remarks in the November 1999 interview. In the interview, Mr Johnson said that Mr. Jenkins was being "over[ly] sensitive" in response to Mr. Fitzhenry's handling of the incident with Mr. Christenbury; that "one of the problems that white people have with blacks is that you all tend to generalize everything"; that Mr. Johnson did not want to call over to Mr. Jenkins' office and "hear any rap music blasting in the background"; and that "many of the guys are going to call [Mr. Jenkins] an Uncle Tom" after this promotion and asking how does it feel to be an Uncle Tom.[2]

In November 2000, Mr. Jenkins met with David Sanders, a Human Resources Analyst, regarding Mr. Johnson's offensive comments. Mr. Jenkins described Mr. Sanders as "very dismissive" of the issues presented during the meeting. Mr. Sanders concluded that Mr. Jenkins was not being discriminated against and did not investigate further.

According to Mr. Jenkins, Mr. Johnson made racist comments on an ongoing basis during Mr. Jenkins' first year under Mr. Johnson's supervision. Mr. Johnson referred to Orr Road as the "black yard" – presumably because Mr. Jenkins, his office assistant, and one of the field supervisors at Orr Road were all black; asked, "How are you getting along with the brothers out there?"; and repeated the Uncle Tom and rap music comments, similar to those described above, on more than one occasion.

In November 2000, Mr. Jenkins received his first Performance Appraisal under Mr. Johnson's supervision. Mr. Johnson awarded Mr. Jenkins a "B" for "Meets Basic Requirements."

---

[2] Mr. Johnson admitted making that statement but insisted that he intended the comment as a "word of caution." Mr. Johnson added that he "made great efforts to promote minority ... employees within [his] divisions" and "wanted very much for ... [Mr. Jenkins] to succeed."

According to the Performance Appraisal, Mr. Jenkins did not meet the requirement of creating an atmosphere of positive morale among his employees. In an attachment to the Performance Appraisal entitled Supervisor's Comments, Mr. Johnson mentioned certain areas of concern with Mr. Jenkins' performance. Cecilia Duignan, a Human Resources Analyst, testified that employees under Mr. Jenkins' supervision complained early on about Mr. Jenkins' management style and that she believed the Operations Supervisor position was "not a good fit" for Mr. Jenkins because he did not have "the level of skills necessary."

In August 2001, Mr. Johnson and Mr. Jenkins took part in a disciplinary meeting for Joseph Vilagos, one of the Field Operations Supervisors assigned under Mr. Jenkins. Mr. Johnson and Mr. Jenkins disciplined Mr. Vilagos for referring to a black crew member as "boy." During that meeting, Mr. Johnson explained to Mr. Vilagos that you should not direct certain words at certain people and said, "Maybe Andrew can explain to us why black people can call each other nigger." Mr. Jenkins was offended by the word, and as the only black present during the meeting, Mr. Jenkins felt that the word was directed at him. Mr. Johnson said, to the contrary, that he was not directing the word at Mr. Jenkins but instead was using it as an example in the context of the coaching session. Mr. Vilagos thought that the word was inappropriate but did not recall that it was directed toward Mr. Jenkins.

In November 2001, Mr. Jenkins received a "G" on his Performance Appraisal for "Good Performance Which Meets and Periodically Exceeds Requirements." In the Performance Appraisal, Mr. Johnson commented that Mr. Jenkins had made progress over the previous year, especially in the area of employee morale.

Also in November 2001, Mr. Jenkins initiated a series of meetings with Jim Humphrey,

Director of the Street Maintenance Division. During the first meeting, held November 8, 2001, Mr. Jenkins reported that Mr. Johnson had made racist remarks over the years. Based on Mr. Jenkins' allegations, Mr. Humphrey performed an investigation in which he spoke with Mr. Johnson about Mr. Jenkins' charges.

In December 2001, Mr. Jenkins and Mr. Humphrey held a second meeting, also attended by Ms. Duignan from Human Resources. In the second meeting, Mr. Humphrey recounted what Mr. Johnson had told him and counseled Mr. Jenkins that Mr. Jenkins needed to submit a written complaint if he wished to proceed any further with the problem. Mr. Humphrey advised Mr. Jenkins that Mr. Johnson would be retiring soon and, as such, that there was no real need to work on a long term relationship. Mr. Johnson announced his retirement in December 2001 but continued to work until May 2002.

After December 2001, Mr. Johnson began "scrutinizing [Mr. Jenkins'] work and making things very difficult" for Mr. Jenkins. Mr. Jenkins charged that, in January 2002, Mr. Johnson referred to "kicking [Mr. Jenkins'] black ass";[3] that Mr. Johnson wrote Mr. Jenkins up for an incident regarding overweight vehicles and DMV tickets; and that Mr. Johnson visited Orr Road an unusual number of times and increased his complaints about the situation at Orr Road in the two months after the meetings with Mr. Humphrey. Mr. Johnson testified that his increased effort at Orr Road was an attempt to improve Mr. Jenkins' performance in preparation for competition with the private sector for road jobs. According to Mr. Johnson, that issue became increasingly important during the late 1990s and up to Mr. Johnson's retirement.

---

[3] In his affidavit, Mr. Johnson denied saying he was going to kick Mr. Jenkins, but admitted that he did give an example of various motivational strategies employed by his old football coach, which included kicking players in the butt.

On February 8, 2002, Mr. Jenkins requested another meeting to discuss his ongoing concerns with Mr. Johnson's racist remarks. Mr. Humphrey, Ms. Duignan, and Mr. Johnson all attended the February 2002 meeting. During the meeting, Mr. Johnson threatened to physically assault Mr. Jenkins, saying, "It's taking all I have to keep from jumping over there on him."[4] Mr. Jenkins responded to the alleged threat by telling those present that he intended to file a grievance against Mr. Johnson. Mr. Johnson replied, "You can file a grievance, but if I were you, I would be concerned with the well-being of my family and your career here with the City."[5] After the February 2002 meeting, Mr. Jenkins notified Mr. Humphrey that he would not file a grievance.

In a memorandum dated May 3, 2002, Mr. Johnson placed Mr. Jenkins on a Ninety-Day Performance Probation ("Probation"). Mr. Johnson stated that the reason for the Probation was "continual failure to attend required meetings." Mr. Johnson explained that Mr. Jenkins failed to attend a meeting on April 19, 2002; that Mr. Jenkins neglected to have members of his staff attend several development meetings; and that Mr. Jenkins should follow the City's policy for future leave requests. In the memorandum's conclusion, Mr. Johnson warned that Mr. Jenkins may be terminated if he failed to perform on the recommendations.

On May 7, 2002, Mr. Johnson issued a Performance Appraisal to evaluate Mr. Jenkins before his Probation. Mr. Jenkins received an "NM" on the Performance Appraisal for "Did Not Meet Basic Requirements." The only focus area Mr. Johnson checked was Attendance and Safety, in

---

[4] Neither Mr. Humphrey nor Ms. Duignan recall Mr. Johnson threatening Mr. Jenkins in the February 2002 meeting. But Ms. Duignan did remember Mr. Johnson getting very upset and then later apologizing to Mr. Jenkins and Mr. Humphrey.

[5] Mr. Johnson denied making the threat but admitted telling Mr. Jenkins that if his performance did not improve "his employment with the City ... might be in jeopardy."

which Mr. Jenkins received an "NM."

On May 13, 2002, Mr. Jenkins issued a written response to the May 3 memorandum by Mr. Johnson. In that response, Mr. Jenkins asserted that he had provided employees with written reminders to attend the meetings that they allegedly failed to attend; that he arrived late to the April 19 meeting and, rather than interrupt, waited with others outside the door; and that he was "hesitant to request future medical leave" after Mr. Johnson's directive, which Mr. Jenkins believed was a reference to an incident from April 29, 2002 when Mr. Jenkins was accused of improperly notifying Mr. Johnson for leave under the Family Medical Leave Act ("FMLA") to take care of his son.[6]

On May 15, 2002, Mr. Jenkins filed a Complaint with the Department of Labor alleging that he was placed on Probation because he had taken leave under FMLA to take care of his son on April 29, 2002. After an investigation, the Department of Labor determined that while the City's policy requiring a one-day notice of an absence was not practical in all situations, the decision to place Mr. Jenkins on Probation was not improper because there were non-FMLA reasons supporting it.

On May 17, 2002, Mr. Jenkins filed a Charge of Discrimination (the "Charge") with the Equal Employment Opportunity Commission (the "EEOC"). In the Charge, Mr. Jenkins stated that his allegations of discrimination were based upon race, disability, and retaliation. Mr. Jenkins alleged that Mr. Johnson had made racial comments toward him, including the use of the word "nigger"; that Mr. Johnson threatened to kick his ass; that Mr. Johnson threatened to harm Mr. Jenkins and his family; that he was placed on Probation after complaining; and that he was paid less than similarly situated white employees. Mr. Jenkins listed the dates that the discrimination took

---

[6] Mr. Jenkins' son has a rare, lifetime condition known as Central Congenital Hypoventilation Syndrome, which causes breathing problems during sleep.

place as March 1, 1998 through May 8, 2002 and described the action as continuing.

On May 21, 2002, Mr. Johnson retired. Layton Lamb was promoted to fill Mr. Johnson's position and became Mr. Jenkins' direct supervisor. Mr. Jenkins testified in his deposition that Mr. Lamb never made racial comments to him and that Mr. Lamb did not have any racial bias. Mr. Jenkins believed, nonetheless, that Mr. Lamb continued a policy of harassment and retaliation initiated by Mr. Johnson, Mr. Lamb's friend.

As support for that assertion, Mr. Jenkins recounted that – prior to Mr. Lamb's promotion – Mr. Lamb told Mr. Jenkins to "get in line with management"; that Mr. Lamb wrote Mr. Jenkins up for minor incidents, including improperly notifying Mr. Lamb before taking a vacation day; that Mr. Lamb told Mr. Jenkins that "if [Mr. Jenkins] wanted to succeed [he] needed to perform certain acts that ... others ... would not have to do"; and that Mr. Lamb said it was unfortunate Mr. Jenkins chose to file a grievance. Based on those actions, Mr. Jenkins believed that he would ultimately be terminated and would lose his health coverage.[7]

On May 24, 2002, Ms. Duignan sent an e-mail to Mr. Jenkins saying, "[I]f you wish to file a grievance, please contact David Sanders." On July 25, 2002, Mr. Jenkins and Mr. Sanders exchanged e-mails. Mr. Jenkins first wrote Mr. Sanders recounting his prior allegations against Mr. Johnson. Mr. Sanders' reply read as follows:

> We have not spoken since that time about your concerns/issues. As I recalled
> you were seeking advise [sic], not filing a complaint. Is the purpose of this email to
> file a complaint? If so, we need to meet. If not, how may I assist you with your

---

[7] Mr. Lamb remembered talking to Mr. Jenkins about Mr. Jenkins' problems with Mr. Johnson but did not recall that the problems were related to race. In his deposition, Mr. Lamb defended his decision to write up Mr. Jenkins for improperly taking a vacation day and testified that he did not recall telling Mr. Jenkins that it was unfortunate that he filed a grievance.

concerns?

Mr. Jenkins did not respond to Mr. Sanders' reply.

On June 10, 2002, Mr. Johnson sent a letter to Mr. Humphrey with the subject line "Response to Accusations of Andrew Jenkins." In the letter, Mr. Johnson denied Mr. Jenkins' charges and expressed his displeasure with the accusations. Mr. Johnson characterized the allegations as "false attacks on character and integrity." According to the letter, Mr. Johnson underwent a polygraph exam – the results of which were attached to the letter – in an attempt to vindicate himself. In conclusion, Mr. Johnson said that he planned no further action but rather would "go on with [his] retirement." Mr. Johnson sent copies of the letter to Ms. Duignan and Mr. Lamb, among others.

On October 17, 2002, Mr. Jenkins applied for transfer to a position as a Drafting Engineer III in the Engineering Department. Mr. Jenkins' transfer brought an immediate increase in pay, but – in the long run – the salary potential was lower, there was less responsibility, and there were fewer opportunities for promotion. According to Mr. Jenkins, he was forced to transfer from his position as Operations Supervisor to a position as a Drafting Engineer III or else face termination.

On November 7, 2002, the EEOC issued a Dismissal and Notice of Rights letter (the "Letter") to Mr. Jenkins in response to his May 17 Charge. In the Letter, the EEOC informed Mr. Jenkins that it was "unable to conclude that the information obtained establishes violations of the statutes" and that, if he wished to file suit, he must do so within ninety days of his receipt of the Letter.

On January 31, 2003, Mr. Jenkins filed a Complaint against the City, alleging that the City discriminated against him in violation of Title VII of the Civil Rights Act of 1964, as amended, codified as 42 U.S.C. § 2000e et. seq., on the basis of his race. Specifically, Mr. Jenkins appears to

complain of discrimination in the form of disparate treatment, hostile work environment, and retaliation. Mr. Jenkins asks for relief in the form of compensatory and punitive damages.

## II. STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure requires that summary judgment be granted if the pleadings, responses to discovery, and affidavits, if any, establish that "there is no genuine issue as to any material fact ...." Fed. R. Civ. P. 56(c). As this Court has previously explained,

> ... the moving party has the initial burden to show a lack of evidence to support [the non-moving party's] case. If this showing is made, the burden then shifts to the [non-moving party] who must convince the Court that a triable issue does exist.

Boggan v. BellSouth Telecomm., Inc., 86 F.Supp.2d 545, 547 (W.D. N.C. 2000) (citations omitted).

A genuine issue of material fact exists if a reasonable jury could return a verdict for the non-moving party on the evidence presented. See Anderson, 477 U.S. at 252. The non-moving party opposing summary judgment cannot "rest upon ... mere allegation or denials ..., but ... must set forth specific facts showing that there is a genuine issue for trial." See id. at 248 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 319 U.S. 253, 288-89 (1968)). Importantly, in deciding a motion for summary judgment, the court views the evidence presented in the light most favorable to the non-moving party – that is, "[t]he evidence of the non-movant is ... believed, and all justifiable inferences are ... drawn in his favor." See Anderson, 477 U.S. at 255.

## III. DISCUSSION

Title VII of the Civil Rights Act of 1964 as amended ("Title VII"), codified as 42 U.S.C. § 2000e et seq., makes it an unlawful employment practice for an employer

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate

against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1). Title VII also prohibits discrimination by an employer against an individual because such individual "has opposed any practice made an unlawful employment practice" by Title VII or "participated in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. §2000e-3(a).

In the Complaint, Mr. Jenkins complains of discrimination in the form of disparate treatment, hostile work environment, and retaliation.[8] The undersigned will address each category of discrimination in turn.

## A. Disparate Treatment

There are two means by which an employee can establish a violation of Title VII by disparate treatment. The first means is by

demonstrating through direct or circumstantial evidence that ... discrimination motivated the employer's adverse employment decision. The employee, however, need not demonstrate that the prohibited characteristic was the sole motivating factor to prevail, so long as it was a motivating factor.

Hill v. Lockheed Martin Logistics Mgm't, Inc., 354 F.3d 277, 284 (4th Cir. 2004) (citing 42 U.S.C. § 2000e-2(m) and Price Waterhouse v. Hopkins, 490 U.S. 228, 241 (1989)). If the employee produces sufficient evidence for a reasonable jury to conclude that race or sex was a motivating factor, See Hill, 354 F.3d at 285,

---

[8] Mr. Jenkins denominates "verbal racial discrimination" as an independent claim. Verbal racial discrimination, however, is not a separate claim but rather is a kind of hostile work environment. As such, the undersigned will evaluate the arguments described by Mr. Jenkins as directed toward his "verbal racial discrimination" claim in the discussion of Mr. Jenkins' hostile work environment claim. See infra III.B.

the burden of persuasion shifts to the employer to prove that it would have reached the same determination without any discriminatory animus. The determination of whether a plaintiff has satisfied this evidentiary threshold is a decision for the district court after it has reviewed the evidence, which ultimately hinges on the strength of the evidence establishing discrimination.

Taylor v. Va. Union Univ., 193 F.3d 219, 232 (4th Cir. 1999) (internal marks and citations omitted),

abrogation on other grounds recognized by, Hill, 354 F.3d at 284-85. If the employer is able to show

that it would have reached the same decision absent the discriminatory animus, the plaintiff is

limited in his available remedies. See Taylor, 193 F.3d at 232; Hill, 354 F.3d at 284.

In the absence of such evidence, the employee must proceed under the analytical framework

first enunciated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

As the Fourth Circuit has concisely explained the McDonnell Douglas framework,

the plaintiff-employee must first prove a *prima facie* case of discrimination by a preponderance of the evidence. If [he] succeeds, the defendant-employer has an opportunity to present a legitimate, non-discriminatory reason for its employment action. If the employer does so, the presumption of unlawful discrimination created by the *prima facie* case drops out of the picture and the burden shifts back to the employee to show that the given reason was just a pretext for discrimination. The plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against [him.]

Evans v. Techs. App. & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1999) (internal marks and citations

omitted).

Because the plaintiff always "bears the ultimate burden," a defendant employer may be

entitled to summary judgment *even if* the plaintiff has established a prima facie case and shown that

the explanation proffered by his employer is pretextual. See Rowe v. Marley Co., 233 F.3d 825, 830

(4th Cir. 2000).

Even when a plaintiff demonstrates a prima facie case and pretext, his claim should not be submitted to a jury if there is evidence that precludes a finding of

12

discrimination, that is if no rational factfinder could conclude that the action was discriminatory. But absent such evidence, courts may not require a plaintiff who proves both a prima facie case and pretext to produce additional proof of discrimination in order to survive a defendant's motion for summary judgment. This is so because it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation.

Id. (internal marks and citations omitted).

Importantly, regardless whether a plaintiff-employee brings direct or circumstantial evidence or proceeds under the McDonnell Douglas framework, the real issue

in every employment discrimination case is whether the plaintiff was the victim of intentional discrimination. To demonstrate such an intent to discriminate on the part of the employer, an individual alleging disparate treatment based upon a protected trait must produce sufficient evidence upon which one could find that the protected trait actually motivated the employer's decision. The protected trait must have actually played a role in the employer's decision making process and had a determinative influence on the outcome.

Hill, 354 F.3d at 286 (internal marks and citations omitted) (quoting in part Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141 (2000)). When applying the McDonnell Douglas framework, the specific elements making up a prima facie case of discrimination vary depending on the particular claim brought by the plaintiff-employee. McDonnell Douglas Corp., 411 U.S. at 802 n. 13.

In the Complaint, Mr. Jenkins never alleges specific adverse employment decisions that support his general disparate treatment claim. Despite the confusion created by the failure to specify the allegedly adverse employment decisions, Mr. Jenkins' claim appears to fall into four main categories of disparate treatment – disparate wages, disparate discipline, failure to promote, and constructive discharge.

Mr. Jenkins has failed to present either direct or indirect evidence that race was a motivating

factor in any of the contested employment decisions. Although Mr. Jenkins cites examples of discriminatory statements made by Mr. Johnson, all the statements relied on by Mr. Jenkins are temporally removed from the contested employment decisions, and Mr. Jenkins makes no effort to establish a causal connection between the statements and any of the adverse employment decisions. As such, the undersigned will analyze each of Mr. Jenkins' claims of disparate treatment in turn using the appropriate McDonnell Douglas framework.

### i. Disparate Wages

In order to establish a prima facie case of disparate wages, the plaintiff must prove (1) that he is a member of a protected group; (2) that his job performance is satisfactory; (3) that his employer took an adverse employment action against him with respect to compensation; and (4) that similarly situated employees outside the protected class received more favorable treatment. See White v. BFI Waste Services, LLC, 375 F.3d 288, 295 (4th Cir. 2004). Under the McDonnell Douglas framework, once the plaintiff establishes a prima facie case of discrimination, the burden shifts back to the defendant to present a legitimate, non-discriminatory reason for the contested action. See Evans, 80 F.3d at 959.

In the Complaint, Mr. Jenkins alleges that he was paid lower wages than similarly situated white employees because of his race. Mr. Jenkins, however, provides no support for this initial allegation. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 591 (1992) ("In response to a summary judgment motion, ... the plaintiff can no longer rest on such mere allegations, but must set forth ... specific facts ....") Assuming Mr. Jenkins had provided support for the disparate wages claim, which he did not, the City has provided a legitimate, non-discriminatory explanation – that the alleged similarly situated white employees received higher pay because of their seniority.

Because Mr. Jenkins has failed to establish a prima facie case, and because Mr. Jenkins did not show that the City's legitimate, non-discriminatory explanation was a pretext for discrimination, the City is entitled to summary judgment on Mr. Jenkins' disparate wages claim.

### ii. Failure to Promote

In order to establish a prima facie case of discrimination based on a failure to promote, the plaintiff must prove that he (1) is a member of a protected group; (2) applied for the position in question; (3) was qualified for the position; and (4) "was rejected for the position under circumstances giving rise to an inference of unlawful discrimination." McNairn v. Sullivan, 929 F.2d 974, 977 (4th Cir. 1991); see also Evans, 80 F.2d at 959-60. Assuming that the plaintiff successfully establishes a prima facie case and the employer then proffers a legitimate, non-discriminatory reason for its decision, the plaintiff – in attempting to show that the reason proffered by the employer is pretextual – must demonstrate that he was the better qualified candidate for the position sought. See Evans, 80 F.2d at 960. Importantly, it is the "perception of the decision maker which is relevant, not the self-assessment of the plaintiff." Id. (citation omitted).

Mr. Jenkins alleges that he "has not been able to improve his status or title within" the City and "is in the exact same position he was in when he started out working for the City." These allegations are directly contradicted by the record, which shows that Mr. Jenkins received two promotions since beginning with the City in 1997.[9] Furthermore, Mr. Jenkins has not shown that he applied for, but did not receive, any particular position – a necessary element of a failure to promote claim. Because Mr. Jenkins has failed to establish the required elements of a prima facie

---

[9] Indeed, Mr. Jenkins admitted in his deposition that his current position as Drafting Engineer III is senior to his initial position as Drafting Engineer II.

case and has misconstrued the facts as presented in the record, the City is entitled to summary judgment on Mr. Jenkins' failure to promote claim.

### iii. Disparate Discipline

In order to establish a prima facie case of discrimination based on disparate discipline, a plaintiff must prove that he is (1) a member of a protected group; (2) "engaged in prohibited conduct similar to that of a person of another race, color, sex, religion or national origin[;]" and (3) "that disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person." Moore v. City of Charlotte, 754 F.2d 1100, 1105-06 (4th Cir. 1985).

Applying the elements of disparate discipline to Mr. Jenkins' Probation, it is uncontested that Mr. Jenkins is a member of a protected group. Mr. Jenkins, however, provides no evidence that a person of another race engaged in similar prohibited conduct and received less severe disciplinary measures. As such, Mr. Jenkins has failed to satisfy the second and third requirements of the prima facie case. Furthermore, even if Mr. Jenkins had established a prima facie case, he has not met the ultimate burden of demonstrating that the City acted with discriminatory intent in imposing the discipline. See Moore, 754 F.2d at 1106. Because Mr. Jenkins has failed to establish a prima facie case, the City is entitled to summary judgment on Mr. Jenkins' disparate discipline claim.

### iv. Constructive Discharge

In order to support a claim for constructive discharge, the plaintiff must show that the employer created "intolerable working conditions in a deliberate effort to force the employee to resign." Bartges v. Univ. of N.C. at Charlotte, 908 F.Supp 1312, 1331 (W.D. N.C. 1995). As such, the elements of a constructive discharge claim are (1) that the employer acted deliberately and (2)

that the working conditions were intolerable.  Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1354 (4th Cir. 1995) (citation omitted).  An employer acts deliberately when he intends his actions to force the employee to quit.  Id.  A plaintiff may demonstrate deliberate conduct by showing that the employer "failed to act in the face of known intolerable conditions."  Id.  Courts assessing whether working conditions were intolerable apply "an objective standard of whether a reasonable person in the employee's position would have felt compelled to resign."  EEOC v. Clay Printing Co., 955 F.2d 936, 944 (4th Cir. 1992) (internal citations omitted).

Mr. Jenkins brings an atypical constructive discharge claim.  In the usual case, the plaintiff employee quit his position and is no longer employed by the defendant employer.  Here, Mr. Jenkins alleges that he was forced to abandon his position as an Operations Supervisor and to transfer to the Engineering Department because his supervisor deliberately created intolerable working conditions; that he would have been terminated had he not transfered to a different department within the City; and that the position to which he transferred – Drafting Engineer III – had lower salary potential, fewer responsibilities, and fewer opportunities for promotion.  Even though Mr. Jenkins voluntarily chose to transfer to a different department and never left the City's employ, the undersigned will, nonetheless, consider Mr. Jenkins' claim under the framework of constructive discharge.  Cf. Boone v. Goldin, 178 F.3d 253, 259 (4th Cir. 1999) (stating that an adverse employment action can arise from "reassignment with significantly different responsibilities") (citation omitted).

Mr. Jenkins alleges deliberate conduct by two of his direct supervisors – Mr. Johnson and Mr. Lamb – and by other supervisors and members of Human Resources.  With respect to Mr. Johnson, Mr. Jenkins argues that Mr. Johnson regularly made racist remarks; that Mr. Johnson repeatedly threatened to terminate Mr. Jenkins; and that Mr. Johnson placed Mr. Jenkins on

Probation in an attempt to make good on his threats. What Mr. Jenkins fails to acknowledge is that – although Mr. Johnson may have acted deliberately with respect to these charges – Mr. Johnson's conduct could not have forced Mr. Jenkins to transfer, because Mr. Johnson was no longer working for the City when Mr. Jenkins requested and received the transfer.

With respect to Mr. Lamb, Mr. Jenkins alleges that Mr. Lamb continued a policy of harassment started by Mr. Johnson, that Mr. Lamb made certain comments that led Mr. Jenkins to believe he would be terminated, including that Mr. Jenkins needed to "get in line with management"; and that Mr. Lamb took disciplinary action against Mr. Jenkins for improperly taking vacation time. Mr. Jenkins admits, however, that he had "no reason to believe that [Mr. Lamb] has any racial bias." As such, Mr. Lamb's conduct cannot be characterized as a deliberate effort to force Mr. Jenkins to quit.

With respect to the other supervisors and members of Human Resources, Mr. Jenkins alleges that they failed to take remedial action after Mr. Jenkins complained of racial discrimination. The record, however, does not support this allegation. Mr. Sanders and Ms. Duignan – Analysts in Human Resources – both advised Mr. Jenkins to submit a written grievance, which he failed to do. Mr. Humphrey, the Director of the Street Maintenance Division, performed a personal investigation into Mr. Jenkins' charges. Mr. Jenkins also testified in his deposition that "Mr. Johnson is the only person that ... [took] ... racially motive [sic] activities" against Mr. Jenkins. Based on the foregoing, the undersigned concludes that no employee of the City engaged in a deliberate effort to force Mr. Jenkins to transfer to the Engineering Department.

Even if Mr. Jenkins' employer had acted deliberately, Mr. Jenkins still does not satisfy the

second element of constructive discharge – that working conditions were objectively intolerable. The record shows that Mr. Johnson – the person responsible for the offensive remarks – no longer worked for the City at the time of the EEOC Charge; that Mr. Jenkins successfully completed his Probation; and that, according to Mr. Jenkins, no other employee acted with racial motivation – including Mr. Jenkins' direct supervisor, Mr. Lamb. Accordingly, the undersigned concludes that a reasonable person in Mr. Jenkins' position would not have felt compelled to resign. In summary, because Mr. Jenkins has failed to satisfy either element of his atypical constructive discharge claim, the City is entitled to summary judgment on that claim.

### B. Hostile Work Environment

As discussed above, Title VII prohibits discrimination with respect to any terms, conditions or privileges of employment based on an individual's race or sex. 42 U.S.C. § 2000e-2(a)(1). In Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57 (1986), the Supreme Court confirmed that the statutory language "terms, conditions, or privileges of employment" included the environment in which an employee was to work. See id., 477 U.S. at 65-66. In other words, a plaintiff may prove a violation of Title VII by showing that discrimination based on his race or sex "has created a hostile or abusive work environment." Id. at 66.

Because behavior that creates a hostile work environment "does not present a factual question of intentional discrimination which is at all elusive," Henson v. City of Dundee, 682 F.2d 897, 905 n. 11 (11th Cir. 1982), the McDonnell Douglas burden-shifting framework is generally inapplicable to hostile environment cases. See Katz v. Dole, 709 F.2d 251, 255 (4th Cir. 1983), abrogation on other grounds recognized by Mikels v. City of Durham, N.C., 183 F.3d 323, 329, 329 n. 4 (4th Cir.

1999); Henson, 682 F.2d at 905 n. 11;1 Barbara Lindemann & Paul Grossman, Employment Discrimination Law 782-83 (3rd ed. 1996) [hereinafter Discrimination Law].  Instead, to survive summary judgment on claims of a racially hostile work environment, a plaintiff must demonstrate that a reasonable jury could find the actions taken were (1) unwelcome; (2) based on race; and (3) "sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere." Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir. 2001) (citation omitted).

 Regarding the third prong, the Fourth Circuit has explained,

> [t]he degree of hostility or abuse to which [the plaintiff] was exposed can only be determined by examining the totality of the circumstances.  Relevant considerations may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.  To be actionable, the conduct must create an objectively hostile or abusive work environment, and the victim must also perceive the environment to be abusive.

Id. (internal marks and citations omitted).

 In addition to establishing that a racially hostile work environment existed, the plaintiff must also establish sufficient basis for imposing liability upon the employer.  Id.   An employer will not be subject to liability for a hostile work environment if the employer can show, by a preponderance of the evidence, that

> (1) it exercised reasonable care to prevent and correct promptly any harassing behavior; and (2) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

Id. at 186 (internal marks and citations omitted).

 In support of his hostile work environment claim, Mr. Jenkins alleges that Mr. Johnson made

offensive racial remarks to Mr. Jenkins, which involved physical threats; that Mr. Johnson made disproportionately frequent visits to Mr. Jenkins' worksite; and that both Mr. Jenkins and Mr. Lamb unjustifiably imposed discipline or reprimanded Mr. Jenkins for his conduct.

Applying the elements of a hostile work environment claim, Mr. Jenkins must first demonstrate that the employer's actions were unwelcome. Mr. Jenkins complained to Human Resources and other supervisors on multiple occasions about perceived mistreatment from Mr. Johnson. Accordingly, the undersigned concludes that Mr. Johnson's actions were unwelcome.

Next, the plaintiff must show that the unwelcome actions were based on race. Mr. Johnson used the word "nigger" in Mr. Jenkins' presence – although Mr. Johnson did not call Mr. Jenkins a "nigger" – and referred to kicking Mr. Jenkins' black ass. Given the racial nature of these alleged statements and viewing the evidence in the light most favorable to Mr. Jenkins, the undersigned concludes that Mr. Jenkins has also satisfied the second element of a hostile work environment claim.

Finally, Mr. Jenkins must demonstrate that the offensive conduct was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere." Mr. Jenkins has certainly alleged incidents in which Mr. Johnson's remarks were severe and hostile. First, Mr. Johnson's use of the word "nigger" in Mr. Jenkins' presence, even if not intended as a direct slur toward Mr. Jenkins, is certainly more than a "mere offensive utterance." See Spriggs, 242 F.3d at 185 ("Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates."). Second, the reference to kicking Mr. Jenkins'

"black ass" is a physical threat and demonstrates a high degree of hostility.

Deplorable as the incidents alleged by Mr. Jenkins were, however, their frequency over the course of Mr. Jenkins' five year employment with the City does not satisfy the legal requirement that the offensive conduct must be pervasive. The Supreme Court has held that in order to be deemed pervasive, the incidents of racial harassment "must be more than episodic," but rather "they must be sufficiently continuous and concerted." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998). For example, in White v. BFI Waste Services, LLC, the Fourth Circuit reversed the district court's holding that the evidence in the record was inadequate to support a finding that the harassment plaintiffs suffered was sufficiently severe or pervasive to give rise to a hostile work environment. White, 375 F.3d at 298. In White, supervisors regularly directed racial slurs at the plaintiff and other black employees, including consistently calling the employees "boy, jigaboo, nigger, porch monkey, and Zulu warrior."

The evidence in this case, viewed in the light most favorable to Mr. Jenkins, indicates that Mr. Johnson made several racial remarks to Mr. Jenkins from the time Mr. Jenkins was promoted in November 1999 until Mr. Johnson's retirement in May 2002; that no other supervisor directed any racially offensive comments toward Mr. Jenkins, including Mr. Lamb – Mr. Jenkins' supervisor at the time the Complaint was filed; that Mr. Jenkins did not see Mr. Johnson on a daily basis but typically met with Mr. Johnson about once a month; and that it was unusual in one stretch for Mr. Johnson to visit the Orr Road facility eight times in two months. By comparison, the racist remarks alleged in the present case are not nearly as severe or pervasive as those experienced in White. Based on the foregoing, although the incidents alleged by Mr. Jenkins were reprehensible, the undersigned concludes – after careful thought – that they were not sufficiently continuous to be

deemed pervasive under the law.

In summary, Mr. Jenkins has failed to show that the City's conduct was pervasive and as such has failed to satisfy the third element of a hostile work environment claim. Because Mr. Jenkins has not established a prima facie case of hostile work environment, and because Mr. Jenkins has not presented facts upon which a reasonable jury could return a verdict in his favor, the City is entitled to summary judgment on the hostile work environment claim.

### C. Retaliation

As discussed above, Title VII prohibits discrimination by an employer against any individual because such individual "has opposed any practice made an unlawful employment practice" by Title VII, or "participated in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e-3(a). In the absence of substantial, direct evidence of retaliation, an employee may establish a violation of Title VII by retaliation through use of the McDonnell Douglas framework discussed supra III.A. See Ross v. Communications Satellite Corp., 759 F.2d 355 (4th Cir. 1985) ("The sequence of proof and burdens prescribed by [McDonnell Douglas] are applicable to retaliation cases under § 2000e-3 as well as to discriminatory treatment claims."), overruled on other grounds by, Price Waterhouse, 490 U.S. 228; Discrimination Law 673-77. To reiterate briefly, the plaintiff must first establish a prima facie case, which – with respect to retaliation – requires proof

> (1) that [he] engaged in protected activity; (2) that the employer took adverse employment action against [him]; and (3) [that] a causal connection existed between the protected activity and the adverse action.

McNairn, 929 F.2d at 980 (citation omitted). Once the plaintiff has made out a prima facie case, the employer has the opportunity to present a legitimate, non-discriminatory reason for the adverse

employment action. See Evans, 80 F.3d at 959. If the employer does so, the presumption of discrimination drops from the case and the employee bears the burden of establishing that the reason proffered by the employer is a pretext for discrimination. See id.; McNairn, 929 F.2d at 980. The employee must do so by showing "both that the reason was false and that retaliation was the real reason for the challenged conduct." Holmes v. West, 2000 WL 365400, *4 (4th Cir. 2000) (internal marks and citation omitted).

Applying the elements of retaliation, Mr. Jenkins first alleges that he engaged in two separate protected activities: (1) that he repeatedly complained to supervisors and to Human Resources, beginning in November 2000, and (2) that he filed an EEOC Charge on May 17, 2002. Both of these activities are protected and therefore, satisfy the first requirement of a prima facie case of retaliation. See Bryant v. Aiken Reg'l Med. Ctrs., Inc., 333 F.3d 536, 543-44 (4th Cir. 2003) (holding that complaints to supervisors of suspected Title VII violations constituted protected activity).

Next, Mr. Jenkins alleges three adverse employment actions taken in response to his complaining to supervisors and filing of an EEOC complaint: (1) that he received negative Performance Appraisals; (2) that he was placed on Probation; and (3) that he was disciplined for improperly notifying Mr. Lamb before taking a vacation day. The undersigned will address, in turn, each of the alleged adverse employment actions taken in retaliation to the two protected activities.

### i. Alleged Retaliation for Complaints to Supervisors and Human Resources

### a. Negative Performance Appraisals

Mr. Jenkins received two Performance Appraisals between November 2000, when he first complained to Mr. Sanders of discrimination, and May 2002, when he was placed on Performance

Probation.  On the first Performance Appraisal, dated November 2000, Mr. Jenkins received a "B" rating for "Meets Basic Requirements."  Mr. Jenkins alleges that he received the rating from Mr. Johnson in retaliation for complaining to Mr. Sanders.  On the second Performance Appraisal, dated November 2001, Mr. Jenkins received a "G" rating for "Good Performance Which Meets and Periodically Exceeds Requirements."  As such, Mr. Jenkins' allegation of negative Performance Appraisals is limited to the November 2000 Performance Appraisal – the only negative Performance Appraisal Mr. Jenkins received during the contested period.

An adverse employment action is one that affects "the terms, conditions, or benefits of employment."  Von Gunten v. Maryland, 243 F.3d 858, 866 (4th Cir. 2001) (quoting Munday v. Waste Mgm't of N. Am., Inc., 126 F.3d 239, 243 (4th Cir. 1997)).  As such, an unfavorable Performance Appraisal can constitute an adverse employment action if it affects the terms, conditions, or benefits of employment.  See id. at 867.  Mr. Jenkins presents no evidence that the November 2000 Performance Appraisal adversely affected the terms, conditions, or benefits of his employment.  To the contrary, the record indicates that Mr. Jenkins received an increase in pay concurrent to the Performance Appraisal.  Furthermore, Mr. Jenkins has failed to demonstrate a causal connection between the protected activity of complaining to his supervisors and the negative Performance Appraisal.  Instead, Mr. Jenkins merely asserts that the two are related without any evidence that Mr. Johnson – the supervisor who prepared the Performance Appraisal – even knew that Mr. Jenkins had spoken to Mr. Sanders in November 2000.

Even assuming that the Performance Appraisal does constitute an adverse employment action and that a causal connection exists, the City has articulated a legitimate, non-discriminatory reason for the alleged action – that Mr. Jenkins' performance as supervisor raised genuine areas of concern,

as demonstrated by the Performance Appraisal. Ms. Duignan's testimony that Mr. Jenkins struggled early on in his position as Operations Supervisor supports the validity of these concerns. Mr. Jenkins presents no evidence to satisfy his burden of showing that the City's proffered reason for the Performance Appraisal was mere pretext for discrimination. In summary, because Mr. Jenkins has failed to establish a prima facie case with respect to retaliation in the form of negative Performance Appraisals, and because Mr. Jenkins cannot show that the City's proffered reason is a pretext for discrimination, the City is entitled to summary judgment on Mr. Jenkins' claim of retaliation with respect to the negative Performance Appraisals.

### b. Probation

Mr. Johnson placed Mr. Jenkins on Probation on May 17, 2001, just before Mr. Johnson retired. Although Mr. Jenkins successfully completed his Probation and was not terminated, the Probation was more severe than a negative Performance Appraisal and thus, affected the terms, conditions, and benefits of Mr. Jenkins' employment. Furthermore, Mr. Jenkins testified that the City withheld his annual bonus as a result of the Probation. As such, the undersigned concludes that the Probation was an adverse employment action.

Courts have held that a short period of time between the protected activity and the adverse employment action can satisfy the causal connection requirement of a retaliation claim. E.g. Greene v. Swaine County P'ship for Health, 342 F.Supp.2d 442, 453 (W.D. N.C. 2004) (finding a causal connection when the plaintiff's complaints to management occurred near in time to her termination). Mr. Jenkins was placed on Probation less than three months after the February 2002 meeting with Mr. Humphrey, Ms. Duignan, and Mr. Johnson. Given the proximity in time and the alleged threats

made by Mr. Johnson in the meeting, the undersigned concludes that Mr. Jenkins has satisfied the causal connection requirement. See id. ("The Fourth Circuit has generally found the causal connection element satisfied where the period of time between the protected activity and employment action is around three months.") (citation omitted).

The May 3, 2002 memorandum placing Mr. Jenkins on Probation provides two legitimate, non-discriminatory reasons for the adverse employment action: (1) that Mr. Jenkins failed to attend an important meeting, and (2) that Mr. Jenkins failed to have employees under his supervision attend important developmental meetings. Although Mr. Jenkins argues that these reasons are mere pretext for discrimination, the record indicates that Mr. Jenkins was in fact late to the alleged meeting and that certain employees under his supervision missed several important meetings despite written reminders from Mr. Jenkins. As such, Mr. Jenkins has failed to satisfy his burden of showing that the offered reason was false and that the real basis for the decision was discrimination. In summary, because Mr. Jenkins cannot show that the City's proffered reason is a pretext for discrimination, the City is entitled to summary judgment on Mr. Jenkins' claim of retaliation in the form of Probation.

### ii. Alleged Retaliation for Filing an EEOC Charge[10]

Mr. Jenkins only offers one concrete example of an adverse employment action taken by Mr. Lamb following the EEOC Charge: that Mr. Lamb disciplined Mr. Jenkins for taking an improper vacation day. Disciplining an employee for violating the City's attendance policy, however, is not an adverse employment decision. See Von Gunten, 243 F.3d at 869 ("[T]erms, conditions, or

---

[10] In support of his retaliation claim, Mr. Jenkins alleges that discriminatory remarks were made following his filing the EEOC Charge and that these retaliatory statements forced him to transfer positions within the City. These allegations were discussed in detail above, and the same analysis applies in the context of retaliation. See supra A.iv.

benefits of a person's employment do not typically, if ever, include general immunity from the application of basic employment policies or exemption from a state agency's disciplinary procedures.") (internal quotation omitted). Because Mr. Lamb's disciplinary action is not an adverse employment action, Mr. Jenkins has failed to establish a prima facie case, and the City is entitled to summary judgment on this claim of retaliation.

## IV. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED THAT** the "Motion for Summary Judgment" (Document No. 10) is **GRANTED**. _____

**Signed: July 26, 2005**

David C. Keesler
United States Magistrate Judge